IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RAYNELL CARMICHAEL,                    ) No. C 07-5622 CW (PR)
                                       )
            Plaintiff,                 ) ORDER GRANTING DEFENDANTS'
                                       ) MOTION FOR SUMMARY JUDGMENT
       v.                              )
                                       )
JAMES E. TILTON, et al.,               ) (Docket no. 44)
                                       )
            Defendants.                )
_____   )

INTRODUCTION

Plaintiff Raynell Carmichael, a state prisoner incarcerated at San Quentin State Prison (SQSP), brought this <u>pro se</u> civil rights case under 42 U.S.C. § 1983, alleging that prison officials at High Desert State Prison (HDSP) and SQSP were deliberately indifferent to his serious medical needs from 2003 through 2007 because they denied him proper medical care for his "elevated alkaline phosphatase" levels and complaints of "pain" in his "neck, back, shoulder right and left, elbow, right knee, etc." (Attach. to Compl. at 10.)

On September 22, 2008, the Court found that Plaintiff had adequately alleged a cognizable Eighth Amendment claim of deliberate indifference to his serious medical needs against SQSP Defendants Physicians Sundarson, Wilson, David, Emami, Slater, Zalpuri, Corzine and Daszko as well as Nurse Practitioners Erickson and Hopking. The Court dismissed Plaintiff's claims relating to his incarceration and the conditions of his confinement at HDSP, including all claims against HDSP Defendants Felker, Sandhan,

Rohlfing, Dickerson, Dial, James and Roche without prejudice to refiling in the United States District Court for the Eastern District of California. The Court also dismissed with prejudice Plaintiff's claim against Defendant Grannis relating to the grievance process and dismissed Plaintiff's supervisory liability claims against Defendants Hickman, Tilton, Sillen, Ayers, St. Clair, Saylor and Kana with leave to amend within thirty days.

On November 10, 2008, because Plaintiff failed timely to amend the supervisory liability claims, the Court dismissed these claims without prejudice (docket no. 30).

On April 1, 2009, all remaining Defendants -- Sundarson, Wilson, David, Emami, Slater, Zalpuri, Corzine, Daszko, Erickson and Hopking -- filed the present motion for summary judgment on the grounds that they did not act with deliberate indifference to his serious medical needs, that they did not cause Plaintiff any deprivation of his constitutional rights, that Plaintiff may not sustain a § 1983 suit against them in their official capacities, and that they are entitled to qualified immunity because a reasonable medical practitioner could have believed their conduct was lawful (docket no. 44). Plaintiff filed an opposition to Defendants' motion on April 30, 2009 (docket no. 48). Defendants filed a reply on May 21, 2009 (docket no. 49).

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

I.  Plaintiff's Elevated Alkaline Phosphatase Levels Detected

On June 28, 2005, Plaintiff was transferred to SQSP. (Compl. at 14.) On December 22, 2005, he underwent a blood test, which

2

displayed an elevated alkaline phosphatase reading.[1]  (Maiorino Decl., Ex. A at 165.)

On January 6, 2006, Nurse Practitioner Erickson diagnosed Plaintiff with hypertension, irritable bowel syndrome and hyperlipidemia.  (Id., Ex. A at 13.)  Nurse Practitioner Erickson recommended continuing Plaintiff's current medication to treat these afflictions.  (Id.)

On March 30, 2006, Plaintiff, for the second time at SQSP, displayed an elevated alkaline phosphatase level.  (Id., Ex. A at 18.)

In May, 2006, an unnamed doctor ordered tests to determine the cause of the elevated alkaline phosphatase level.  (Pl.'s Decl. in Supp. of Serious Inadequate Medical Treatment Continues, Ex. 12.) The doctor was primarily concerned with the possibility of myeloma. (Id.)  According to Plaintiff, the doctor at this visit prescribed a pain medication which effectively relieved Plaintiff's back pain. (Id.)

On June 1, 2006, Plaintiff went to the emergency room at Novato Community Hospital complaining of abdominal pain and expressing concern that his elevated alkaline phosphatase levels were indicative of a tumor.  (Maiorino Decl., Ex. A at 20-21.)  Dr. Thompson confirmed that Plaintiff's alkaline phosphatase levels were elevated, prescribed a stool softener, and recommended increased fruit and fiber intake.  (Id.)  Pursuant to Dr. Thompson's requests, Plaintiff received a CT-scan and a series of x-rays in early June to detect cancer.  (Id., Ex. A at 22-23, 26-27.)  Tests reported no

_____

[1] Phosphatases are a group of enzymes found in the liver and bone.  The primary purpose of checking the levels of alkaline phosphatase is to detect liver or bone disease.

cancer but indicated degenerative changes in the spine "probably due to" Plaintiff's obesity. (Id.) The imaging report from the CT-scan also recommended a nuclear bone scan. (Id., Ex. A at 22-23.)

On July 7, 2007, Plaintiff underwent the nuclear bone scan. (Id., Ex. A at 37-38.) Dr. Cohen analyzed the results and concluded that there was possible evidence of soft tissue damage which could indicate the infiltration of a disease.

On August 24, 2006, in response to Plaintiff's concerns about possible cancer, he was sent to Dr. Sowerby for a colonoscopy. (Id., Ex. A at 5.) Dr. Sowerby noted that Plaintiff's results were normal except for a benign four millimeter left colon polyp. (Id.)

II.  Consultation with UCSF Physicians and Continued Testing

On August 29, 2006, due to difficulty in determining the cause of Plaintiff's elevated alkaline phosphatase and pain, prison officials consulted University of California San Francisco (UCSF) physicians, Drs. Suiter and Shavit. (Id., Ex. A at 52-53.) Those doctors concluded that Plaintiff's lab and imaging abnormalities were indicative of metabolic bone disease "possibly due to a vitamin D deficiency." (Id.) The doctors recommended the following treatment plan: (1) continuous vitamin D and alkaline phosphatase testing going forward; (2) if the levels test low, "aggressive [vitamin D] replacement and . . . an endocrine consultation"; and (3) "more aggressive pain control along with diet and weight loss counseling." (Id.)

On September 12, 2006, Plaintiff was sent to East Bay Cardiology for a consultation, complaining of shortness of breath, chest pain, and elevated alkaline phosphatase levels. (Id., Ex. A at 58-59.) The consulting doctor noted that Plaintiff was taking

4

United States District Court
For the Northern District of California

tramadol for pain at the time of the visit.  (<u>Id.</u>)

On November 7, 2006, Plaintiff met with Dr. Epstein for an x-ray examination of his left shoulder.  (<u>Id.</u>, Ex A at 61.)  Dr. Epstein noted that the shoulder was unremarkable aside from a slight narrowing at the acromioclavicular joint.  (<u>Id.</u>)

On November 14 and 28, 2006, Plaintiff complained of left shoulder pain to Dr. Daszko.  (<u>Id.</u>, Ex. A at 61, 63.)  Dr. Daszko prescribed Ultram to supplement Plaintiff's tramadol dose.  (<u>Id.</u>)  Additionally, Dr. Daszko treated Plaintiff's vitamin D deficiency by prescribing 50,000 units of vitamin D bi-daily for three weeks and then 50,000 units once a day for three months.  (<u>Id.</u>, Ex. A at 63.)

On January 3, 2007, Plaintiff was sent to Dr. Epstein, who took x-rays of his right knee.  (<u>Id.</u>, Ex. A at 66.)  Dr. Epstein found that both knees were normally aligned with only mild degenerative sharpening in the right knee.  (<u>Id.</u>)  Dr. Epstein concluded that osteoarthritis was the likely cause of Plaintiff's right knee pain. (<u>Id.</u>)

III. SQSP Physicians Manage Pain and Refer Plaintiff to Specialists

On February 26, 2007, Plaintiff was sent to Dr. David, complaining that he was experiencing significant pain in his knees, hips and low back.  (<u>Id.</u>, Ex. A at 68-69.)  Dr. David noted that the cause of the increased pain was that Plaintiff decided to stop the methadone that was previously ordered despite the fact that it was successfully controlling his pain.  (<u>Id.</u>)  Instead, Plaintiff reverted to tramadol which "does not control the pain as well as the methadone . . . ."  (<u>Id.</u>)  Dr. David also noted elevated levels of both alkaline phosphatase and vitamin D.  (<u>Id.</u>)  In response to

these developments, Dr. David prescribed MS Contin (an opiate) for pain, discontinued methadone treatment, and advised Plaintiff to continue tramadol until the MS Contin became available. (<u>Id.</u>) Dr. David noted that if the root problem was the vitamin D deficiency, the three months of supplementation would have aided more than was evidenced. (<u>Id.</u>) Accordingly, Dr. David reduced Plaintiff's vitamin D dose from 50,000 units daily to 50,000 units weekly and recommended both bone density testing and hip x-rays. (<u>Id.</u>)

On March 1, 2007, following the UCSF physicians' recommendations, Plaintiff saw Dr. Madrilejo, an outside endocrinologist. (<u>Id.</u>, Ex. A at 72-72.) Dr. Madrilejo noted that Plaintiff's vitamin D levels had dropped and recommended both a full metabolic panel and a bone density scan. (<u>Id.</u>)

On March 2, 2007, pursuant to Dr. David's recommendation, Plaintiff saw Dr. Epstein for hip x-rays. (<u>Id.</u>, Ex. A at 75.) Dr. Epstein noted that Plaintiff's hips appeared normal and that Paget's disease[2] was doubtful. (<u>Id.</u>)

On March 5, 2007, Plaintiff saw Dr. David for a follow-up, complaining that he had not yet received his pain medication. (<u>Id.</u>, Ex. A at 81-82.) Dr. David noted that she called the pharmacy to determine the cause of the delay and that the pharmacy asserted that there was no MS Contin currently available. (<u>Id.</u>) Dr. David also noted that, at Plaintiff's February 26, 2007 visit, she instructed

---

[2] Paget's disease is a chronic bone condition characterized by disorder of the normal bone remodeling process. Paget's disease commonly causes no symptoms and is incidentally noted when x-ray tests are obtained for other reasons. However, Paget's disease can cause bone pain, deformity, fracture and arthritis.

him to take tramadol for pain until the MS Contin she prescribed became available at the pharmacy. (Id.) Dr. David noted that Plaintiff admitted that he had tramadol in his possession. (Id.) Dr. David also noted that she ordered a bone density scan in accord with Dr. Madrilejo's March 1, 2007 recommendation. (Id.) Finally, Dr. David observed that Plaintiff's chief complaint was his knee pain and that although "[his] pain may actually respond quite well to a local joint injection . . . [he] is refusing to be considered for joint injections and would just like to continue on oral pain medications for now." (Id.) Dr. David recommended physical therapy and physical conditioning and noted that "if [Plaintiff] changes his mind regarding intervention for his knee, we will refer him either to minor procedure clinic or orthopedics for evaluation for joint injection." (Id.)

On March 27, 2007, Plaintiff went to Marin Medical Laboratories for his bone density scan following Dr. Madrilejo's recommendation and Dr. David's order. (Id., Ex. A at 76-77.)

On April 26, 2007, Plaintiff saw Dr. Madrilejo for a follow-up visit, complaining of left hip pain. (Id., Ex. A, 78-79.) Dr. Madrilejo noted that the etiology of the elevated alkaline phosphatase levels was not clear and that x-rays of the hip were not suggestive of Paget's disease. (Id.) Dr. Madrilejo recommended that Plaintiff see a metabolism expert at the University of Southern California (USC) and asserted that he could do nothing more to help. (Id.)

On May 7, 2007, Plaintiff saw Dr. David for a follow-up from his second appointment with Dr. Madrilejo. (Id., Ex. A at 90-91.)

Dr. David noted that Plaintiff's vitamin D deficiency had been adequately treated, that his alkaline phosphatase levels were still elevated, and that although his complaints of pain continued, Plaintiff "says pain is tolerable with his current medications which are MS Contin and Naprosyn . . . [and] a little nighttime dose of amitriptyline." (<u>Id.</u>) Dr. David noted that Plaintiff would be "referred to a metabolism specialist at the request of Dr. Madjerlaho [sic]" but clarified that the specialist would have to be at UCSF, not USC due to the geographical location of SQSP. (<u>Id.</u>)

On May 25, 2007, Plaintiff saw a second outside endocrinologist, Dr. O'Connor. (Pl.'s Decl. in Supp. of Serious Medical Condition, Ex. 3.) Dr. O'Connor noted that Plaintiff's vitamin D levels were high and that any pain was likely due to osteoarthritis. (<u>Id.</u>) Dr. O'Connor recommended maintaining the current level of medication and to continue testing for alkaline phosphatase levels. (<u>Id.</u>)

On June 4, 2007, Plaintiff saw Dr. David for a follow-up appointment, reporting that he had run out of a number of his medications and that he "felt his pain was better controlled" by the MS Contin regimen. (Maiorino Decl., Ex. A at 97.) Dr. David reported contacting the pharmacy who informed him that they now had the medications available. (<u>Id.</u> at 98.) Additionally, Dr. David noted that Plaintiff, who had at this point received a steroid injection in his left shoulder, was handling the shoulder pain significantly better as a result of the injection. (<u>Id.</u> at 97.) Dr. David noted that Plaintiff's vitamin D deficiency was being successfully treated with vitamin D supplementation, that his joint

8

pain was likely due to osteoarthritis, and that she would take Dr. O'Connor's suggestion of preliminary testing for inflammatory arthritis. (Id. at 98.) Additionally, Dr. David noted that "for [Plaintiff's] pain, we will increase his Elavil to 30 mg at night, also increase his MS Contin to 60 mg in the morning and continue MS Contin 30 mg in the evening." (Id.)

On June 21, 2007, Plaintiff saw Dr. David for a follow-up appointment, reporting stiffness and popping in his right thumb, elbow and shoulder and asserting that "he is not sure exactly how long it has been getting worse" but denying any prolonged pain. (Id., Ex. A at 99-100.) Plaintiff informed Dr. David that, in his opinion, exercise may be the problem. (Id.) Dr. David noted that Plaintiff maintained full range of motion in all areas. (Id.) She recommended range of motion and weight-bearing exercises, and advised Plaintiff to take pain medication when he experienced pain and stiffness. (Id.) Dr. David also ordered x-rays of Plaintiff's hand. (Id.)

On June 27, 2007, Plaintiff saw Dr. Epstein for his hand x-rays. (Id., Ex. A at 101.) Dr. Epstein noted that Plaintiff's wrists appeared "unremarkable" with "no significant arthritic change." (Id.)

On July 7, 2007, Plaintiff went to the Nuclear Medicine Department at Novato Community Hospital for a nuclear total body scan following Dr. Madrilejo's recommendation. (Id., Ex. A at 102.) The report indicated that the "faint and patchy" areas of the scan "may be related to soft tissue attenuation," which were consistent with "possible infiltration of a disease." (Id.)

On July 20, 2007, Plaintiff saw Dr. David for a follow-up appointment, complaining that his left shoulder was "hurting as bad as it did prior to his injection." (<u>Id.</u>, Ex. A at 103.) Plaintiff requested an additional steroid injection, and he also reported a "new discomfort of numbness and tingling in his fourth and third fingers on his left hand" as well as lower back pain exacerbated by walking. (<u>Id.</u>) Dr. David noted that, during the exam, Plaintiff was "clenching and unclenching his hands and crossing his arms across his body . . . in a fluid brisk motion without any difficulty." (<u>Id.</u> at 104.) Dr. David recommended that Plaintiff stay active, lose weight, and continue his exercises. (<u>Id.</u>) Dr. David noted that she would continue to monitor Plaintiff's back pain, that he did not show any symptoms indicative of a neurologic compromise, and that his osteoarthritis pain was currently tolerable and controlled by his medical regimen. (<u>Id.</u>) Finally, Dr. David noted that they had been unable to schedule Plaintiff with a bone and metabolism specialist, in accord with Dr. Madrilejo's February 26, 2007 recommendation, but that Plaintiff had an upcoming endocrinology consultation. (<u>Id.</u>)

On August 24, 2007, Plaintiff saw Dr. O'Connor for a follow-up consultation, complaining of pain in the neck, left shoulder and back. (<u>Id.</u>, Ex. A at 105-06.) Dr. O'Connor noted that Plaintiff's vitamin D levels "dropped off rapidly" and that Plaintiff exhibited a low oral calcium intake. (<u>Id.</u>) To explain his low oral calcium intake, Plaintiff asserted that he was lactose intolerant. (<u>Id.</u>) Dr. O'Connor recommended initiating ergocalcifil (a calcium supplement) and a rheumatological consultation "to assess

[Plaintiff] for other causes of arthritis and pain." (<u>Id.</u>)

On August 27, 2007, Plaintiff saw Physician's Assistant (P.A.) Nancy Bahnsen for a left shoulder steroid injection pursuant to Dr. David's recommendation. (<u>Id.</u>, Ex. A at 113-14.) Plaintiff informed P.A. Bahnsen that, in his opinion, vitamin D deficiency was not the cause of his elevated alkaline phosphatase and that he needed to see a rheumatologist. (<u>Id.</u>) P.A. Bahnsen observed that Plaintiff had full range of motion in his shoulder and no change in pain during posterior lift off. (<u>Id.</u>) P.A. Bahnsen administered the injection, noted that Plaintiff was only permitted to have three injections annually, and recommended that he wait at least six months before his next injection. (<u>Id.</u>)

On September 6, 2007, Plaintiff saw Dr. David for a follow-up appointment, complaining of joint aches. (<u>Id.</u>, Ex. A at 115-17.) Plaintiff asserted that, since his August 27, 2007 injection, his shoulder pain had "improved." (<u>Id.</u>) Dr. David noted that Plaintiff also claimed the numbness and tingling in his hands had lessened. (<u>Id.</u>) Dr. David attempted to explain the reason for Plaintiff's elevated alkaline phosphatase levels, stating:

> Exact etiology of his elevated alkaline phosphatase may, in fact, be multifactorial. He certainly has osteoarthritis. He also has vitamin D deficiency. Failure of his alkaline phosphatase to improve with replacement may indicate other processes, and I think we need to consider Paget's disease in our differential diagnosis.

(<u>Id.</u>) Dr. David noted that she would refer Plaintiff for a gastrointestinal evaluation, that she would order lab tests for Paget's disease, and that she would check shoulder x-rays for Paget's disease. (<u>Id.</u>) Dr. David noted that if the plain films showed findings consistent with Paget's disease, she would consider

11

prescribing fosamax for his pain and elevated alkaline phosphatase levels. (Id.)

On September 17, 2007, Plaintiff saw Dr. Epstein, who took x-rays of his shoulder pursuant to Dr. David's September 6, 2007 order. (Id., Ex. A at 118.) Dr. Epstein noted "no definite evidence to suggest Paget's disease." (Id.)

On October 2, 2007, Plaintiff saw Dr. Rand who addressed his complaints of pain by increasing his MS Contin regimen. (Pl.'s Decl. in Supp. of Serious Inadequate Medical Treatment Continues, Ex. 1.)

IV.  Paget's Disease Diagnosis and Treatment

On October 8, 2007 Plaintiff saw Dr. Rand for analysis of a CT-scan. (Id. at 3.) Dr. Rand took the CT-scan to her colleague, a bone metabolism expert at UCSF, and diagnosed him with Paget's disease. (Id.) Defendants then ordered an MRI, a CT-scan, a bone scan and more x-rays. (Id.) Thereafter, Plaintiff was prescribed fosamax, vitamin D and calcium supplements, which proved to be successful in treating his Paget's disease. (Id. at 5, Ex. 2 at 6.)

On November 6, 2007, Plaintiff filed the present action.

LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no

material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991). A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991), <u>cert. denied</u>, 502 U.S. 994 (1991). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 323.

**United States District Court**
For the Northern District of California

Plaintiff claims that Defendants were negligent in providing treatment for his elevated alkaline phosphatase levels, decreased vitamin D levels and associated pain. He claims that Defendants never initiated a particular test to discover the cause of the elevated alkaline phosphatase levels and back pain. (Pl.'s Compl. at 15.) Specifically, Plaintiff alleges that: (1) Defendants administered an "excessive dose of vitamin D" resulting in progressive deterioration of his medical condition; (2) after months of misdiagnosing Plaintiff's condition as vitamin D deficiency, Defendants "recognized Plaintiff suffered from Paget's disease and began to prescribe medications and therapy to mask the effects of their failures with pain medications: Ultram, Methadone, Morphine, Amitryptiline and Steroid injections"; and (3) Defendants failed timely to identify Paget's disease. (Opp'n at 4-5.) Plaintiff asserts that he was in substantial pain for the two years after his arrival at SQSP. (Pl.'s Compl. at 15.)

Deliberate indifference to serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997)(en banc); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986). The analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of two elements: (1) a prisoner's serious medical needs and (2) a deliberately indifferent response by the defendants to those needs. McGuckin, 974 F.2d

at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "wanton infliction of unnecessary pain." _Id._ (citing _Estelle_, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. _Id._ at 1059-60 (citing _Wood v. Housewright_, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

Defendants acknowledge that Plaintiff's elevated alkaline phosphatase, vitamin D deficiency, joint pain and related problems amounted to serious medical needs. However, Defendants argue that Plaintiff fails to show that, during the course of their evaluations and treatment, they were deliberately indifferent to his serious medical needs.

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. _Farmer v. Brennan_, 511 U.S. 825, 837 (1994). In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. _McGuckin_, 974 F.2d at 1060; _Shapley v. Nevado Bd. of State Prison Comm'rs_, 766 F.2d 404, 407 (9th Cir. 1985). Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown

15

in the way in which prison officials provided medical care.  <u>See</u>
<u>McGuckin</u>, 974 F.2d at 1062.

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment.  <u>See</u> <u>Franklin v. State</u> <u>of Or., State Welfare Div.</u>, 662 F.2d 1337, 1344 (9th Cir. 1981); <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1130 (9th Cir. 2004); <u>McGuckin</u>, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); <u>O'Loughlin v. Doe</u>, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain).

Here, Plaintiff's claim that Defendants were negligent in providing treatment and accurately diagnosing his ailment does not support a claim of deliberate indifference.  The record amply shows that Defendants provided adequate care to Plaintiff.  Even if the definitive diagnosis of Paget's disease was delayed, the record shows that Defendants examined Plaintiff on multiple occasions and gave him adequate treatment for his pain from June 28, 2005 through November 6, 2007.  During this period, Plaintiff had over ten primary care visits, multiple specialist visits, numerous imaging consultations, various x-rays, two CT-scans, a nuclear bone scan and a colonoscopy.  He also received a variety of specialty care for his elevated alkaline phosphatase levels, decreased vitamin D levels and associated pain.  As soon as Defendants received the results of the August 29, 2006 UCSF consultation with Drs. Suiter and Shavit,

16

Defendants immediately followed their treatment recommendation.
Defendants also followed the UCSF physicians' advice and continued
blood testing for both alkaline phosphatase and vitamin D.  Upon
discovering low vitamin D levels, Defendants followed the UCSF
physicians' recommendations of employing "aggressive" vitamin D
replacement.  Plaintiff was then immediately referred to Dr.
Madrilejo, an outside endocrinologist.  Finally, Defendants followed
the UCSF physicians' recommendation of referring Plaintiff to
physical therapy and taking a more aggressive approach to his pain
treatment.  For pain, Defendants not only prescribed tramadol,
methadone and MS Contin, but also administered multiple steroid
injections.  The pain treatment was initially successful.  When
Plaintiff chose to take himself off the medication, Defendants
immediately prescribed alternative pain therapy.  In addition,
Defendants went above and beyond the UCSF physicians'
recommendations by ordering multiple x-rays, full metabolic panels,
and a nuclear bone scan.

Moreover, the evidence demonstrates that during the period of
treatment Defendants were constantly searching for a root cause of
Plaintiff's symptoms.  However, the delay in reaching the Paget's
disease diagnosis was not a result of deliberate indifference but
rather of the inherent difficulty in isolating the disease.  See
Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor
entitled to summary judgment where plaintiff presented no evidence
that delays between plaintiff's initial visit, diagnosis and visit
to the specialist were within the doctor's control, that the doctor
was deliberately indifferent to the medical needs, or that the delay
contributed to plaintiff's injuries).  Even though Defendants, on

multiple occasions, received results inconsistent with Paget's
disease, they never ruled out a diagnosis of that disease.  For
example, Drs. Madrilejo and Epstein noted that Plaintiff's hip x-
rays were not suggestive of Paget's disease.  However, Drs. David
and Rand continued testing Plaintiff and seeking further
consultation until he was definitively diagnosed with Paget's
disease.  Defendants successfully treated him with prescribed
medications.  Further, throughout the delay in reaching that
diagnosis, Defendants responded to Plaintiff's complaints of pain
and continued to give him follow-up care according to his medical
needs.  Defendants prescribed medication for Plaintiff's pain as
well as for his insufficient oral calcium intake and vitamin D
levels.  Therefore, considering the evidence in the light most
favorable to Plaintiff, the Court finds it insufficient to raise a
dispute of material fact that Defendants were deliberately
indifferent to Plaintiff's serious medical needs.  <u>Cf.</u> <u>Ortiz v. City
of Imperial</u>, 884 F.2d 1312, 1314 (9th Cir. 1989) (summary judgment
reversed where medical staff and doctor knew of head injury,
disregarded evidence of complications to which they had been
specifically alerted and, without examination, prescribed
contraindicated sedatives).

Plaintiff further argues that both the treatment he received
from Defendants and their attempt to mask their failures led to
further permanent injuries.  Specifically, Plaintiff alleges that

> an excessive dose of vitamin D given to him by
> defendants caused or made worse his Paget's disease due
> to defendant's misdiagnosis of his serious medical
> condition resulting in deterioration progressively.
> After months of misdiagnosis and upon realizing what
> was initially thought to be merely a vitamin D
> deficiency, defendants recognized plaintiff suffered
> from Paget's disease and began to prescribe medications

18

and therapy to mask the effects of their failures with
pain medications: Ultram, Methadone, Morphine,
Amitryptiline, and steroid injections.

(Pl.'s Opp'n at 4). First, Plaintiff provides no evidence linking
his progressive deterioration to Defendants treatment plan. More
importantly, Plaintiff's argument amounts to a difference of
opinion, i.e., Defendants prescribed too much vitamin D and used
pain medication to mask their failures. For example, Plaintiff
argues that, on November 12, 2006, Dr. Daszko failed to address
"appropriately" his vitamin D deficiency. (Pl.'s Compl. at 17).
Similarly, Plaintiff contends that Dr. David failed to reduce his
vitamin D supplementation resulting in further injury. (Id. at 18.)
Finally, Plaintiff asserts that Defendants failed to diagnose him
adequately. (Id. at 14-15.)

Even if Plaintiff should have received different treatment, he
presents no evidence that Defendants were deliberately indifferent
to his serious medical needs. Rather, Defendants: (1) diagnosed his
medical conditions as they arose; (2) monitored his status with
follow-up treatment; (3) provided physical therapy, access to a
dietician, multiple specialists and powerful prescription drugs to
control his pain; and (4) ultimately successfully diagnosed and
treated him for Paget's disease. Thus, Plaintiff has failed to
provide evidence regarding an essential element of this claim.
Accordingly, the Court GRANTS Defendants' motion for summary
judgment.

III. Qualified Immunity

Defendants claim, in the alternative, that even if Plaintiff's
allegations revealed a constitutional violation, qualified immunity
would protect them from liability for Plaintiff's deliberate

indifference claim.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rule of qualified immunity provides ample protection to "all but the plainly incompetent or those who knowingly violate the law;" defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. Saucier v. Katz, 533 U.S. 194, 202 (2001) (internal quotation marks and citation omitted).  The threshold question in qualified immunity analysis is:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established."  Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818 (2009).  Where there is no clearly established law that certain conduct constitutes a constitutional violation, the defendant cannot be on notice that such conduct is unlawful.  Rodis v. City and County of S.F., 558 F.3d 964, 970 (9th Cir. 2009).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable defendant that his conduct was unlawful in the situation he confronted.  Saucier, 533 U.S. at 202.

On these facts, viewed in the light most favorable to Plaintiff, Defendants prevail as a matter of law on their qualified

immunity defense because the record establishes no Eighth Amendment violation. See Harlow, 457 U.S. at 818. However, even if a constitutional violation had occurred with respect to Plaintiff's claim of deliberate indifference to his serious medical needs, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful. See Estate of Ford, 301 F.3d at 1049-50.

Defendants do not dispute that Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established during the period within which the injuries complained of occurred.

Given the circumstances, Defendants' actions were reasonably calculated to alleviate Plaintiff's pain and ultimately identify and treat the core cause of Plaintiff's condition. Based on the evidence available to Defendants, their actions were reasonable and appropriately tailored to Plaintiff's condition and symptoms. Defendants' actions eventually resulted in a definitive diagnosis of Paget's disease and a successful treatment plan. Therefore, a reasonable person in Defendants' situation could have believed that his actions did not violate Plaintiff's clearly established constitutional rights.

Accordingly, Defendants are entitled to qualified immunity with respect to Plaintiff's deliberate indifference claim, and their motion for summary judgment is GRANTED on those grounds as well.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (docket no. 44) is GRANTED. The Clerk of the Court shall enter judgment, terminate all pending motions, and close the file.

All parties shall bear their own costs.

This Order terminates Docket no. 44

IT IS SO ORDERED.

DATED: 3/17/2010

_____
CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

RAYNELL CARMICHAEL,

        Plaintiff,

  v.

RODERICK HICKMAN et al,

        Defendant.

_____/

Case Number: CV07-05622 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 18, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Raynell  Carmichael D-25366
San Quentin State Prison-2N1-L
San Quentin,  CA 94974

Dated: March 18, 2010

Richard W. Wieking, Clerk
By: Sheilah Cahill, Deputy Clerk